**INTERNATIONAL ORE & FERTILIZER CORP.,** Plaintiff,

v.

**SGS CONTROL SERVICES INC.,** Defendant.

No. 87 Civ. 6391 (CHT).

United States District Court, S.D. New York.

Aug. 23, 1990.

Kirlin, Campbell & Keating (Richard Sommer, J. Scot Provan, Robert A. Milana, of counsel), New York City, for plaintiff.

Schoeman, Marsh, Updike & Welt (Charles B. Updike, Scott M. Riemer, of counsel), New York City, for defendant.

## OPINION

TENNEY, District Judge.

Plaintiff, International Ore and Fertilizer Corporation ("Interore"), brings this breach of contract, breach of warranty, negligence and misrepresentation action against defendant, SGS Control Services, Inc. ("SGS"), alleging that SGS improperly inspected and certified as suitable the holds of a ship hired by Interore to ship fertilizer from Tampa, Florida to New Zealand. Specifically, plaintiff contends that an SGS inspector did not perform a workmanlike inspection of the cargo holds in that he failed to observe a residue of barley in each hold. Plaintiff claims that the barley contaminated the fertilizer and ultimately caused New Zealand authorities to reject the cargo in those holds. The case was bifurcated and the liability portion was tried to the court which, for the reasons set forth below, denies recovery under the breach of contract claim but finds that defendant is fifty percent liable on the claim of negligent misrepresentation. The following, including those additional facts referred to in the Discussion, constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

*Background*

1. Interore is a Delaware corporation with its principal place of business in New York, New York. It is a vendor of fertilizer products in the international market. Stipulated Fact 1; *see* Tr. 3–4.

2. SGS is a New York corporation with its principal place of business in New York, New York. It provides inspection, testing and control services in connection with the movement of bulk cargoes. Stipulated Fact 2.

3. On or about May 29–30, 1985, Interore entered into a contract to sell 22,202 metric tons of compound fertilizers to East Coast Fertilizer Company Limited ("East Coast") for $4,118,287. *See* Stipulated Fact 5.

4. Interore's agreement with East Coast was on a cost and freight basis, whereby title to the product passed as soon as it was loaded on the ship and East Coast was responsible for securing its own insurance for the product. Tr. 52.

5. This was the first such arrangement that Interore had entered into with East Coast, but it had provided fertilizer to a buyer in New Zealand on one prior occasion. Tr. 50.

6. On June 7, 1985, Interore entered into a voyage charter party agreement to charter the vessel M/V ADELINA to transport the fertilizer from Landskrona, Sweden and Tampa, Florida to Napier, New Zealand. Pl.Exh. 2, Complaint ¶ 7.[1]

7. The agreement with East Coast required Interore to secure the services of a hold inspector. On June 19, 1985, Interore entered into a contract with SGS to inspect the holds of the ADELINA when it arrived in Tampa to determine whether they were suitable to load fertilizer, and also to super-

---

**1.** Under the voyage charter, the owner of the vessel had an obligation under its contract with Interore to provide a vessel with clean holds. Pl.Exh. 2 ¶¶ 2, 31. The shipowner is not a party to this action.

vise the loading, sampling, and chemical analyses of the fertilizer. Stipulated Fact 5; Tr. 11. The loading and sampling services were performed without incident and are not part of this complaint.

8. Interore had hired SGS to perform similar services 200–400 times previously. Tr. 12. As in the past, the oral agreement between plaintiff and defendant was memorialized in a telex sent by Interore to SGS, which stated in pertinent part:

Pls act our behalf performing inspection, sampling and analysis. Pls issue flwg docs: 1) Cert of hold inspection, confirming vsls holds were clean, dry and suitable.

Pl.Exh. 19; see Tr. 13–14.

9. Interore paid SGS $150 (three holds at fifty dollars per hold) for the cleanliness survey, and an additional $1,859.92 for the other services. Pl.Exh. 30.

*The Ship and its Prior Cargos*

10. The ADELINA is a 16,356 ton bulk carrier of Greek registry built in 1977 and owned by Blue Falcon Shipping Corp. The vessel has five cargo holds. Holds two, three, four and five each measure 26.4 meters long, 24.6 meters wide, and 14.23 meters high. Hold one is slightly narrower at the front. Tr. 176; Pl.Exh. 1; Def.Exh. C, D. The holds are separated fore and aft by vertical bulkheads. *See* Tr. 183.

11. At the aft end of each hold is an "Australian" ladder, a staircase or step ladder running at an angle rather than vertically, with hand railings and steps rather than rungs. *See* Pl.Exh. 21 (Picture 21). There is a standard vertical ladder attached to the forward bulkhead. Pl.Exh. 21 (Picture 21). The Australian ladder is accessed through a manhole cover on the deck of the ship. Tr. 180–81.

12. On the port and starboard side of each hold are vertical ribs protruding out from the hull a distance of approximately two feet. *See* Pl.Exh. 21 (Pictures 1, 22). The ribs extend from the top of the hold to about eight feet off the floor where the lower section of the hold wall runs off at a forty-five degree angle toward the floor. Tr. 237, Def.Exh. D. The angled portion of the hold's wall covers the ship's wing tanks and measures twelve feet from the floor of the hold to the point at which it joins the side of the hull.

13. Horizontal bars, called stringers, are attached at regular intervals to the front of the vertical ribs, forming a checkerboard pattern on the port and starboard side of each hold. Pl.Exh. 21 (Picture 1); Def.Exh. D. Stringers are not commonly found in bulk carriers built today, but are quite common in older ships such as the ADELINA. Tr. 401.

14. Nested between some of the ribs are vertical pipes running along the hull from the top of the hold to the top of the wing tank. Each pipe is protected by a series of short, horizontal bars affixed to the front of the two ribs between which the pipe sits. Pl.Exh. 21 (Picture 1). Although they extend downward only as far as the top of the wing tank, these short horizontal bars resemble and can be used as a ladder. Tr. 184–85.

15. At the top of each hold is a square hatch opening. The dimensions of the opening on hold one are 12.5m × 8.6m, and 16.7m × 12m on holds two, three, four and five. Def.Exh. C. Around the opening of the hatch, supporting the deck of the ship, are a series of deck beams. These consist of a vertical beam approximately three feet high with a horizontal lip on the lower edge, which protrudes out several inches on either side of the vertical beam. *See* Tr. 182; Pl.Exh. 20 (Picture 22).

16. On December 17, 1984, the ship carried a full cargo of barley from England to Iran. Pl.Exh. 13, 27, 28. The holds were filled to the top with the grain. Tr. 178, 254. On April 30, 1985, the vessel carried a cargo of iron ore and coal from South Africa to Rotterdam, Sweden. Pl.Exh. 13, 27, 28.

17. After the coal was discharged, the crew of the ship cleaned and painted the cargo holds. Tr. 166–67, 322–23. The cleaning was inadequate because the crew failed to remove a substantial amount of barley grains from pockets behind the stringers and the protruding lips of the deck beams. In addition, the crew painted

over some of the barley that was left in the hold, although a substantial amount of barley remaining was not painted over. Pl. Exh. 20 at 3–5.

*The Inspection in Landskrona*

18. The ADELINA arrived in Landskrona on June 10, 1985, where it was to be loaded with 7,353 metric tons of fertilizer into holds one and four. Stipulated Fact 3.

19. Mr. Jan Litting, an inspector from defendant's affiliate in Sweden—SGS Skandinaviska Kontroll AB—surveyed holds one and four. He brought with him an apprentice inspector, Mr. Ulf Svensson. Tr. 312–13.

20. Litting boarded the ship at approximately 7:00 p.m. and spoke with the first mate. He asked that the hatch cover for hold one be opened halfway. Tr. 314, 336. While this was being done, he asked the mate about the prior cargos of the ship. Tr. 332, 334.

21. He then inspected the hatch covers and proceeded to go down the Australian ladder into the hold, stopping periodically to inspect the deck beams and condition of the paint. Tr. 315–16, 339.

22. When he reached the bottom of the hold, he ordered the hatches all the way open to see if the process of opening them caused anything to fall from the covers, which it did not. Tr. 316–17.

23. He then walked all around the tank top (floor of the hold) and looked at the stringers from below, Tr. 318, and climbed the vertical ladder to inspect them from the side, Tr. 344.

24. He and Mr. Svensson repeated this process in hold four, spending about twenty to twenty-five minutes in hold four and twenty minutes in hold one, which is smaller than hold four. Tr. 337.

25. Upon emerging from the second hold, Litting spoke with the mate again, asking him what kind of paint had been used in the holds and who had painted them. Tr. 322. He then approved the holds as clean, dry and suitable to receive the cargo. Tr. 327; Pl.Exh. 3.

26. The inspectors then went ashore and Litting called his supervisor to report his findings, making note of the fact that the holds had been freshly painted. Tr. 325. The ship departed Landskrona on June 13, 1985, bound for Tampa. Stipulated Fact 3.

*Arrival in Tampa and Mr. Luard's Inspection*

27. SGS hired a subcontractor, Captain Peter Luard ("Luard"), to perform a hold cleanliness inspection in Tampa for the remaining holds. Luard had worked in the maritime industry for many years but had regularly performed hold inspections only since 1981. Tr. 267–72. In 1981 he worked for SGS in Savannah, Georgia, performing hold inspections and draft surveys exclusively for coal cargos. Tr. 273. SGS transferred him to Tampa in 1983 where he performed surveys almost entirely for ships waiting to load fertilizer. *Id.* In late April, 1985, he left SGS to form his own company but did contract work periodically for SGS. Tr. 274.

28. The ADELINA arrived in Tampa on June 30, 1985. Stipulated Fact 4; Def.Exh. M at 1. After spending over a day at anchor, the ship picked up a pilot at 9:45 p.m. on July 1, who guided it through the harbor. Def.Exh. M at 2. At 1:20 a.m. on July 2, two tug boats were secured to the ship to bring it to the pier. *Id.* at 3. Between 1:20 and 1:45, the tugs moved the ship alongside the pier and the process of making the ship fast to the dock began. *Id.* All lines were fastened by 1:45. *Id.*

29. Luard entered the ship along with the plaintiff's representative and United States customs and immigration officials between 1:30 a.m. and 1:45 a.m. *See id.;* Tr. 85.[2]

2. Although the record does not indicate precisely what happened between 1:20 and 1:45, the vessel would naturally have been maneuvered to the pier by the tugs, untied from them, and then secured to the dock. It would seem virtually impossible for Luard to have been aboard the ADELINA before 1:30, as he contends is the case. On the other hand, he may well have been aboard prior to 1:45. Defendant's expert explained that a ship's gangway is frequently put down after just a few lines are tied and that the time of 1:45 a.m. on the deck log and a

30. Upon entering the ship, Luard requested that the hatch to hold five be opened, which took about five minutes. Tr. 291–92, 304. Luard began to inspect the hatch cover to the first hold at approximately 1:45 a.m.

31. Luard then walked down the aft Australian ladder, stopping periodically for a brief inspection of the stringers and the overhead deck beams. Tr. 294–95. He proceeded to walk around the floor of the hold looking for foreign matter, and then aimed his flashlight up onto the face of the stringers and the bottom of the overhead beams. Tr. 295. He repeated this process in holds two and three. Tr. 131. At no point during his inspection did Luard attempt to look behind the stringers. Tr. 297, 303. Nor was he able to examine the upper surface of the lip of the deck beams, except to the extent that he attempted to observe the condition of the beams nearest his vantage point on the Australian ladder. Tr. 294–95.

32. He completed his inspection of the holds at 2:15 a.m., having spent approximately ten minutes in each hold. Tr. 291–92; Def.Exh. M at 3. He then spoke to the chief mate and had a cup of coffee. Tr. 136.

33. In speaking with the mate, he learned that the prior two cargos had been barley and coal, respectively. He did not return to the holds to reinspect them for residue of either of these two materials. Tr. 137, 299–300.

34. At 2:15 a.m., Luard completed a document entitled "Certificate of Readiness." This was a standard form that had been prepared by SGS. It consisted of typewritten text and blank spaces, which Luard filled in by hand. He also supplemented the typed text, as indicated below in brackets. The completed form stated in relevant part:

Certificate of Readiness

This is to certify that the undersigned Marine Surveyor did, at the request of

_____ on behalf of _____ did attend on board the M.V./Adelina of 16,356.78 Gross Tons, Port of Registry Piraeus, whereof Capt. Matselos P is Master and now lying at Gardinier Terminal for the purpose of surveying the following cargo holds Nos. 2, 3, and 5. Said cargo compartments [and hatch covers] have been surveyed and found suitable to load a cargo of Phosphate this time and date.

DATE July 2nd 1985
TIME PASSED 0215
Peter F. Luard
SURVEYOR
for SGS CONTROL SERVICES INC.

*   *   *   *   *   *

ALL INSPECTIONS ARE CARRIED OUT TO THE BEST OF OUR KNOWLEDGE AND ABILITY AND OUR RESPONSIBILITY IS LIMITED TO THE EXERCISE OF REASONABLE CARE

Pl.Exh. 14.

35. After Luard signed the certificate, the vessel loaded 6,503 metric tons of fertilizer into hold two, 4,169 tons into hold three, and 4,175 tons into hold five. Stipulated Fact 6.

*The Voyage to Napier and the Condition of the Cargo*

36. The ship departed Tampa on July 4, 1985, and arrived at Napier, New Zealand on August 1, 1985. Stipulated Facts 6, 7; Def.Exh. M at 35.

37. The ship had experienced about a week and one half of rough weather on the voyage from Tampa to Napier. Tr. 223–26; Def.Exh. M at 24–34.

38. When officials of the New Zealand Ministry of Agriculture and Fisheries ("MAF") inspected the cargo in Napier, they discovered that the fertilizer in each hold was contaminated with barley. Pl. Exh. 20 at 2.

39. Later tests revealed that the barley was infected with Tilletia Controversa

variety of other documents, *see* Def.Exh. M; Pl.Exhs. 15, 16, 17, reflects the time that all the lines on the boat were secured. Defendant's expert testified that it could take up to an hour to secure all the lines on a vessel the size of the ADELINA. Tr. 384. The court therefore concludes that Luard was on the ship between 1:30 and 1:45 a.m.

(Dwarf Bunt) and Barley Stripe Mosaic Virus. *Id.* at 7.

40. The MAF officials stated that they would allow the fertilizer to be discharged only if East Coast notified all customers that the fertilizer was contaminated and that it should not be used where barley would be grown in the season following application. East Coast rejected this demand, asserting that it would injure its professional reputation as a supplier of fertilizer. *Id.* at 2; Pl.Exhs. 10, 22.

41. After MAF's initial inspection, the plaintiff hired Dominion Adjusters ("Dominion") to conduct a survey of the cargo and holds. Tr. 41. A representative of Dominion inspected the cargo and found barley lodged on the overheads, stringers and hatch covering returns. Pl.Exh. 20 at 3, 5.

42. Most of the contaminating grains had fallen from the deck beams and hatch covering returns as evidenced by the distribution of grain in the hold. There was little or no contaminant in the "square of the hatches" (the square center of each hold directly under the hatch) but some quantity was present in the fertilizer forming the periphery of the square. *Id.* at 3; Tr. 110, 118, 191.

43. All five holds had a similar level of contamination. *Id.* at 5.

44. The MAF officials and the various parties attempted over several days to resolve the problem, but ultimately the cargo was rejected. The officials believed the barley was layered throughout the heap and therefore refused the suggestion that the crew simply pick up the visible grain ears. *Id.* at 3.

45. The photographs taken by the Dominion inspector show grain lodged behind the stringers, some of it painted over, Pl. Exh. 21 (Pictures 5–7, 11, 16–20, 24, 25, 28,

31, 34, 36, 38, 41 and 42), and also scattered over the fertilizer heap, *id.* (Pictures 2, 3, 8, 12, 17, 26, 27, 32, 33, 35, 39 and 40).

46. The cargo was ultimately resold to a buyer in Antwerp, for less than the contract price between Interore and East Coast. Tr. 49.

## DISCUSSION

### A. *Contract Liability*

■ The telex that Interore sent SGS on June 19, 1985, memorializes the agreement between the parties in this case. It requested SGS to perform a hold cleanliness inspection and to issue a certificate confirming that the holds were clean. The telex did not specify the manner in which the inspection was to be carried out, but correspondence from SGS to Interore, like the Certificate of Readiness prepared by Mr. Luard, provides: "All inspections are carried out to the best of our knowledge and ability and our responsibility is limited to the exercise of reasonable care." Pl. Exhs. 4, 5, 6 and 14. Considering the long history between the parties, that degree of care was incorporated in this contract as well.[3] The parties did not define "reasonable care," but when a contract for services requiring special skills does not contain a provision describing how the service is to be rendered, New York law requires the service be performed in a "workmanlike manner."[4] *Vitol Trading S.A., Inc. v. SGS Control Services, Inc.*, 680 F.Supp. 559, 567 (S.D.N.Y.1987), *rev'd on other grounds*, 874 F.2d 76 (2d Cir.1989); *Lunn v. Silfies*, 106 Misc.2d 41, 44, 431 N.Y.S.2d 282, 284 (Sup.Ct.1980).

Generally speaking, how the service is customarily performed in the industry will be strong evidence of what is reasonable or workmanlike. *See* W. Keeton, D. Dobbs,

---

**3.** Therefore, it is unnecessary to determine whether defendant was also bound by any implied warranty to provide reasonable care. *See Great American Insurance Co. v. Bureau Veritas*, 338 F.Supp. 999, 1013–15 (S.D.N.Y.1972), *aff'd*, 478 F.2d 235 (2d Cir.1973); *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 133–34, 76 S.Ct. 232, 237–38, 100 L.Ed. 133 (1956); Note, *Liability of Marine Surveyors for*

*Loss of Surveyed Vessels: When Someone Other than the Captain Goes Down with the Ship*, 64 Notre Dame L.Rev. 246, 261–70 (1989); McCormack, *Warranties and Disclaimers*, 62 Tul.L. Rev. 549, 560–68 (1988).

**4.** Both parties have assumed that New York law controls.

R. Keeton, D. Owen, *Prosser and Keeton on Torts* § 33 at 194–95 (5th ed. 1984) [hereinafter *Prosser* ]. The parties dispute what the standard in the industry is concerning inspection of the stringers and the overhead beams, the areas where the grain was found. Defendant's expert, Captain Shore ("Shore") and plaintiff's expert, Captain Davenport ("Davenport") agreed that a reasonable inspector, when entering the hold, would stop periodically on the access ladder to direct the beam of a flashlight onto the stringers and deck beams, Tr. 186, 316, and would inspect them again from the tank top. Tr. 186–87, 318, 400. Shore testified that inspectors would thereafter climb the forward vertical ladder to the top of the hold, again stopping periodically to inspect the stringers and deck beams visually. Tr. 186–87. Luard's inspection was substantially similar to the hypothetical survey described by Shore.[5]

Davenport testified that an inspector should take additional measures to check behind the stringers. Specifically, Davenport testified that when he performs an inspection on a vessel with stringers, he runs up the wing tanks and then climbs the pipe guards, looking for contaminant in the pockets formed by the stringers and the vertical ribs. Tr. 238. Shore testified that he does not run up the wing tanks and knows of no inspector who does. Tr. 380, 391. He added that he had once attempted to run up the wing tank of a ship in doing a structural survey, but was unable to do so. Tr. 404. Luard and the Swedish inspector also testified that it was not standard practice to run up the surface of the wing tanks. Tr. 144, 282, 351.

The parties apparently did not have a "meeting of the minds" on precisely what the inspection would entail. Considering their past relationship, each contemplated that the defendant would exercise reasonable care, which obligated it to use workmanlike efforts. In determining what steps this would actually require, plaintiff maintains that the court should interpret "workmanlike conduct" by an objective standard of reasonableness, which would require the surveyor to perform an inspection reasonably calculated to find hidden contaminants. Plaintiff asserts that the surveyor should either climb the wing tanks as Davenport does, or get a ladder from the crew to enable him to inspect behind the stringers. Plaintiff contends that Shore's inspection would be adequate in a modern ship built without stringers, but is inadequate and, therefore unworkmanlike in a ship with stringers. *See Prosser* § 33 at 194 ("[C]ustoms which are entirely reasonable under the ordinary circumstances which give rise to them in the first instance may become entirely unreasonable in the light of a single fact altering the situation in the particular case.") Plaintiff argues that if the industry standard is as defendant's expert describes, it is deficient. Plaintiff cites *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.1932) (Hand, J.) for the proposition that because an entire industry may be negligent, industry custom is only some evidence of what is reasonable; the court must ultimately decide whether the service in question was performed negligently.

Defendant argues first that Davenport's testimony is not credible, claiming it is virtually impossible to run up the wing tanks and climb the pipe guards. Although it may be a difficult procedure in some types of holds, it is certainly not an impossible task, especially in a hold whose wing tanks are shorter and flatter than others. *See* Tr. 238. Even if it could be done, however, SGS claims that the parties contracted only for the standard industry inspection, which did not involve any more extensive checking of the stringers than that carried out by Mr. Luard. *See Vitol*, 680 F.Supp. at 567; *Milau Assoc., Inc. v. North Ave. Dev. Corp.*, 42 N.Y.2d 482, 486, 368 N.E.2d 1247, 1250, 398 N.Y.S.2d 882, 885 (1977) ("[R]easonable care and competence owed general-

---

5. Although the evidence suggests that Luard did not climb the forward vertical ladder, and spent only ten minutes in each hold, *see* Findings of Fact 29–33, the court will assume for the purposes of this discussion that Luard performed an inspection as thorough as that described by Shore. This is because the Swedish inspector substantially performed such an inspection, *see* Findings of Fact 20–25, but nevertheless failed to detect the grain.

ly by practitioners in the particular trade or profession defines the limits of an injured party's justifiable demands."). Indeed, SGS claims that its inspectors have performed inspections without checking behind the stringers on many prior occasions. Noting that contract law allows the parties to agree on whatever type of inspection they choose, SGS argues that the interpretation of the parties' intent regarding the term "reasonable" should be limited by the custom and practices in the industry.

■ Although contract law provides a method to resolve such disputes over interpretation, *see, e.g.,* A. Corbin, *Corbin on Contracts* § 536 (1960 & Supp.1990), the court need not reach the issue of what "workmanlike efforts" would entail. Whether it does, or should, involve efforts as extensive as that suggested by plaintiff or could be satisfied by the inspection performed by Luard, would not be determinative because even if Luard violated his contractual duties, SGS would not be required to pay the full amount of damages plaintiff seeks. The mere fact that one party to an agreement has failed to satisfy a contractual duty of care does not necessarily mean that it will be held fully liable for all resulting damages, even if foreseeable.

> It is not always in the interest of justice to require the party in breach to pay damages for all of the foreseeable loss that he has caused. There are unusual instances in which it appears from the circumstances either that the parties assumed that one of them would not bear the risk of a particular loss or that, although there was no such assumption, it would be unjust to put the risk on that party. One such circumstance is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question. The fact that the price is relatively small suggests that it was not intended to cover the risk of such liability. Another such circumstance is an informality of dealing, including the absence of a detailed written contract, which indicates that there

was no careful attempt to allocate all of the risks. The fact that the parties did not attempt to delineate with precision all of the risks justifies a court in attempting to allocate them fairly.

*Restatement (Second) of Contracts* § 351 comment f (1979). Interore paid SGS fifty dollars per hold or one-hundred fifty dollars to perform the cleanliness inspection in Tampa, and seeks damages of $2,400,000. In a case very similar to the one at bar involving the same defendant, *Vitol Trading S.A., Inc. v. SGS Control Services,* 874 F.2d 76, 81 (2d Cir.1989), plaintiff sought damages in the amount of $547,688 on a contract price of $220, a ratio of approximately 2,500 to one. The Second Circuit explained that if SGS intended to assume so great a risk, it would have charged substantially more for its services. Alternatively, it would have turned down the plaintiff's offer, rather than risk so much for so little.

In this case, the disparity between the contract price and the damages is even greater. Plaintiff seeks damages of $2,400,000 on a contract price of $150, a ratio of 16,000 to one.[6] *See Evra Corp v. Swiss Bank Corp.,* 673 F.2d 951, 956 (7th Cir.) (difference between damages of $2,100,000 too disproportionate to contract price of $27,000), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (1982); *cf. Kenford Co. v. County of Erie,* 108 A.D.2d 132, 137 n. 5, 489 N.Y.S.2d 939, 944 n. 5 (App.Div.1985) (damages not out of proportion to profit defendants could have made), *aff'd,* 67 N.Y.2d 257, 493 N.E.2d 234, 502 N.Y.S.2d 131 (1986). In addition, the parties reached their agreement over the phone, and plaintiff simply confirmed it with a one-page telex. The telex merely requests defendant to perform the various services and to issue a series of documents. It is devoid of any mention of liability. The low contract price and informal dealings between the parties indicates that they did not attempt to allocate all of the risks. Therefore, the court is justified in allocat-

---

**6.** Admittedly this ratio is based on the pleadings; the actual damages may be much lower. Nevertheless, considering that plaintiff will re-

cover fifty-percent under its tort cause of action, the court need not decide how much, if any, it could also recover under a contract theory.

ing them fairly. Accordingly, it finds that plaintiff should not recover compensatory damages on the contract.[7]

## B. *Tort Liability*

The court's denial of recovery under the contract theory is based upon the disparity between the contract price and the damages incurred. Nevertheless, that consideration does not apply to the analysis of defendant's duties under independent tort law.

■ When the duty of one person to another exists solely by virtue of a negotiated agreement, the relationship is normally governed only by the law of contract. *See Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 725 F.Supp. 656, 662 (N.D.N.Y.1989); *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F.Supp. 936, 938 (S.D.N.Y.1989). Accordingly, a violation of that duty does not ordinarily give rise to a remedy in tort. *Niagara*, 725 F.Supp. at 661–62. Nevertheless, if the conduct of one party would constitute a tort in the absence of the contract, then that cause of action is not extinguished simply because some aspects of the relationship between the parties happen also to be governed by an independent agreement. *Id.; see Eaves Brooks Costume Co., Inc. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220, 556 N.E.2d 1093, 557 N.Y.S.2d 286 (1990) (plaintiff may properly bring an action in tort when defendant had assumed a duty to exercise reasonable care to prevent foreseeable harm to plaintiff).

■ Plaintiff has urged two theories under tort law, negligence and negligent representation. Plaintiff's negligence claim asserts that defendant unreasonably failed to detect the presence of the contaminating barley. Essentially, plaintiff argues that defendant had a duty to perform a "reasonable" inspection, which would have at least involved inspecting the stringers on the sides of the hold. Unfortunately, the duty

to inspect the hold arose only by virtue of the contract. For example, without the contract, there would have been no duty requiring defendant to send a representative to inspect plaintiff's ship. Similarly, defendant did not have a duty to perform any particular kind of inspection, except as required under the contract. Indeed, nothing in the law of tort would have imposed additional duties on defendant if the parties had agreed that the surveyor was supposed to conduct only a limited inspection. Since the duty to inspect arose only by virtue of the contract, which was freely negotiated by the parties, there can be no independent tort liability for failing to take certain steps as part of that inspection. *See Niagara* at 662; *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190, 193–94, 521 N.Y.S.2d 653, 656–67 (1987).

■ That does not rule out liability for negligent misrepresentation, however. Under the law of negligent misrepresentation, a person will be held liable for damages arising from the reliance by another on a representation that the person knows, or should have known, was not true. *See White v. Guarente*, 43 N.Y.2d 356, 353, 372 N.E.2d 315, 319, 401 N.Y.S.2d 474, 478 (1977); *Ultramares Corp. v. Touche*, 255 N.Y. 170, 181–82, 174 N.E. 441, 445 (1931). In addition, "[a] representation made with an honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts." *Prosser* § 107 at 745. The agreement called for Luard, after finishing his inspection, to provide a document confirming that he had performed an inspection and found the holds to be suitable to receive the cargo. As previously noted, the parties probably did not have a meeting of the minds as to exactly how, or how extensively, Luard would inspect the holds. They each knew, however, that Luard's inspection was to be the last check before the fertilizer was loaded. Moreover, Luard had the authority

---

**7.** As explained in the following discussion, defendant's erroneous statement that the holds were clean permits plaintiff to recover under the tort theory of negligent representation. Because the court has held that plaintiff cannot

recover under the contract theory, it does not decide whether this incorrect certification also violated any implied warranty that the statements in the "Certificate of Readiness" would be accurate.

to block the loading if he were not satisfied with the condition of the hold. In fact, all of the inspectors including Luard have on occasion delayed the loading of a cargo so that crews could properly clean the holds. *See* Tr. 283–84, 349, 408–09.

■ Therefore, defendant must have realized that if it provided the certificate, plaintiff would take no further steps to determine the state of cleanliness of the holds. Even if, as defendant argues, it had no duty under contract or tort law to do more than was the practice in the industry, it must have been aware that in entering into this agreement, plaintiff was relying, if not on the actual inspection itself, then at least on this document for reassurance that the fertilizer could safely be loaded.

Luard should also have known that his representation about the cleanliness of the holds might have been inaccurate. He testified that he looked at the stringers only from the vantage point of the Australian ladder. Considering the orientation of the stringers and their distance from these ladders, the court is skeptical that Luard could have adequately observed whether they were clean. Even if he could see those portions of the stringers close to the ladders, he should have known that this would not necessarily be indicative of the portions further away. For example, just like Luard, a cleaning crew would have difficulty reaching the center section of the stringers, although it could more easily access the areas by the ladders. *See* Tr. 300. As a matter of common sense, Luard should have realized that the cleanliness of easily accessed areas would not necessarily reflect the condition of those that were difficult to reach.

Both plaintiff's and defendant's experts, as well as Luard, testified that the back of the stringers is an area where one would expect to find cargo residue. Tr. 178–79, 192, 298, 401. Therefore, Luard knew, or should have known, that his limited inspection did not provide a valid basis upon which to state that the hold was, in fact, free of all possible contaminants. Accordingly, he should not have simply signed a certificate that reasonably led plaintiff to assume it was clean.

Instead, Luard should have reported to Mr. Clemente Colon, plaintiff's representative on the ship, that there were areas in the hold that he could not inspect in the course of his routine survey.[8] Colon had the ultimate responsibility for deciding whether the cargo would be loaded. Armed with this information, Colon could have intelligently decided how to proceed. *See* Tr. 74, 93. For example, he might have decided that a further delay was warranted and asked defendant to secure a ladder to check the stringers. Shore testified that it is normal to request a ladder whenever an inspector wishes to see an area that cannot otherwise be accessed. Tr. 408–09. Indeed, in this case, if Luard had told Colon that he could not attest to the cleanliness of the hold, Colon would likely have requested a ladder and this loss would have been avoided. Even in the case of a vessel with overhead beams and no stringers, the plaintiff's representative could take further investigatory steps such as inquiring of the cleaning crew how the beams were cleaned, if at all.[9] Since the risk of an incorrect decision to load might result in a loss of several million dollars, it would seem likely that Colon would have wanted to take whatever additional steps were reasonable under the circumstances to protect the cargo.[10]

**8.** This does not mean that an inspector in Luard's position, must actually meet with the plaintiff's representative. It would have been equally acceptable if the Certificate of Inspection had clearly stated that only those areas actually inspected were found to be clean, and had included a section noting the areas that the inspector was not able to examine.

**9.** If the situation were warranted, the seller's representative might even take extraordinary measures such as lowering a crew member

down from the hatch opening to inspect the beams. Although such action was certainly not contemplated to be part of defendant's inspection, the failure to alert Colon to the possibility of contamination prevented him making a reasoned judgment as to what steps should be taken to help determine how to proceed.

**10.** The court does not address the more difficult situation in which defendant can prove that the plaintiff's representative would not have taken additional steps after learning of the potential

Although Luard was negligent in failing to inform plaintiff that there remained a risk of contamination, part of the reason for his failure was because plaintiff had not brought home to him the risks involved. Tort law attempts, *inter alia*, to put the risk of loss on the party best able to avert it. *See Prosser* § 4. Interore was in the fertilizer business and had previously shipped fertilizer to New Zealand. In fact, Interore sent a representative to New Zealand specifically to handle this contract. Tr. 4, 31. The inspector from Dominion notes in his report that the New Zealand officials are extremely strict regarding the importation of foreign vegetable matter. Pl.Exh. 20 at 8. Since it was in the fertilizer business and had dealings with New Zealand authorities before, plaintiff was in a better position than defendant to know that even minimal contamination of grain could result in rejection by the New Zealand authorities. If it did not know, it should have known because a reasonable seller of fertilizer would have determined the requirements for bringing its product into a foreign country.

When it retained defendant's services, plaintiff could easily have alerted it to the strict standards of cleanliness that were necessary. Had Luard been informed that the slightest amount of foreign matter could contaminate the cargo, he would likely have performed a more thorough inspection. That does not diminish Luard's negligence for representing that the hold was clean, but it illustrates that each party had exclusive knowledge of facts that, if communicated to the other, might well have avoided the risk of loss. The court therefore finds that the plaintiff and defendant are equally responsible for the barley not being discovered and apportions fault at fifty percent each.

## CONCLUSION

Defendant is liable for fifty percent of the damages resulting from contamination of the fertilizer. The actual amount of

damages will be determined in the second phase of the trial.

So ordered.

risk. Nor does it address those situations in which the inspector himself has taken every reasonable step to determine whether the hold was clean, leaving nothing for the plaintiff's representative to do.