**INTERNATIONAL ORE & FERTILIZER CORP., Plaintiff,**

v.

**SGS CONTROL SERVICES, INC., Defendant.**

No. 87 Civ. 6391 (CHT).

United States District Court, S.D. New York.

Aug. 10, 1993.

Kirlin, Campbell, Meadows & Keating, New York City, for plaintiff (Richard H. Sommer and Robert A. Milana, of counsel).

Schoeman, Marsh & Updike, New York City, for defendant (Charles Updike and Scott M. Reimer, of counsel).

## OPINION AND ORDER

TENNEY, District Judge:

In 1987, plaintiff International Ore and Fertilizer Corp. ("Interore") brought an action for breach of contract, breach of warranty, negligence, and misrepresentation against SGS Control Services, Inc. ("SGS"). In 1985, Interore contracted to sell fertilizer to East

Coast Fertilizer Co., Ltd. ("East Coast"). Three of the holds of the M/V ADELINA were used to ship the fertilizer from Tampa, Florida to New Zealand; Interore hired SGS to inspect the holds before the fertilizer was stored.

Although SGS had certified the holds as clean, upon arrival in New Zealand the fertilizer was found to be contaminated with the remains of barley previously stored in the holds. The Ministry of Agriculture and Fisheries ("MAF") refused to allow the fertilizer in the country, and East Coast refused to accept it, except at a significantly reduced price. Interore ultimately shipped the fertilizer to Antwerp and sold it there. This suit followed.

The case was bifurcated and the liability portion was tried before this court. *International Ore & Fertilizer Corp. v. SGS Control Services, Inc.*, 743 F.Supp. 250 (S.D.N.Y. 1990). This court held that compensatory damages were not allowed, that SGS could not be held liable on the theory of negligent inspection of the holds where the duty arose solely by virtue of contract, and that SGS would be held 50% liable on the theory of negligent misrepresentation for approving the holds as suitable without alerting Interore that there were areas of the ship's holds that SGS was not able to inspect. Interore was found to share in the blame, because it failed to notify SGS's inspector of the strict standard of cleanliness required because of both the nature of the cargo and New Zealand's standards regarding the importation of foreign vegetable matter. Familiarity with the prior opinion is assumed.

A three day trial on the damages portion of this case was then heard before Chief Magistrate Judge Nina Gershon. She issued a report and recommendation on March 31, 1993 (the "Report"), which is attached as Appendix A. Pursuant to 28 U.S.C.

§ 636(b)(1) and Federal Rule of Civil Procedure 72(b), the parties were given ten days to submit written objections to the report. By order of this court dated April 12, the time was extended. Both parties submitted timely objections. For the reasons stated below in discussing various objections raised, this court now accepts and adopts all the recommendations in the Report.

## I. Objections to Evidence Heard and Magistrate Judge's Findings

SGS has objected on a number of grounds that go to the narrowing of issues by the magistrate judge at the damages phase. In all respects, however, the magistrate judge acted properly.[1]

### A. Presentation of Proximate Cause Issue

SGS broadly objects that the magistrate judge prevented it from defending on the basis that its conduct was not the proximate cause of the contamination of the fertilizer. SGS claims that this court's opinion "clearly required the second phase of the trial to determine the damages 'resulting from' the contamination of the fertilizer." Defendant's Objections to Report ("Def.Obj."), at 15. SGS interprets this to imply that proximate cause was an issue for determination in the damages phase. SGS proposes either that a hearing now be held specifically for the purpose of litigating the proximate cause issue, or that Interore's damages be significantly reduced.

While objections to specific monetary figures will be addressed below, it should be noted at the outset that the liability phase of the trial did in fact address the causation issues. As the magistrate judge explained, there can be no liability without proximate cause being established. *See* Report at 2; 743 F.Supp. at 259. Implicit in any finding of overall negligence is the idea that causa-

---

1. The court finds it difficult to separate several of SGS's objections that stem from the same root: SGS has to pay costs that it believes are disproportionate to its degree of fault, and it objects that it has been held liable for damages resulting from the contamination. However, this court held previously that SGS would share fault equally with Interore, and its liability was clearly established on the basis of negligent misrepresen-

tation. Thus, the magistrate judge was not at liberty to reconsider liability issues, but to calculate damages. She properly declined to hear again the objections that SGS had to this court's previous opinion. While each objection will be addressed and ruled upon separately, *see* Fed. R.Civ.P. 72(b), those that address issues already ruled upon by this court will not be extensively discussed.

tion—one element of negligence—has been established. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993); *see also infra* part II.A.

**B. Frederick Phillips's Testimony and Economic Conditions**

■ Along similar lines, SGS continues to press its claim that the damages sought by Interore were not caused by the contamination, but rather by poor economic conditions in New Zealand and the MAF's allegedly shocking rejection of the fertilizer. SGS claims that it was barred from presenting evidence at the hearing that would have established this causation.

The magistrate judge heard testimony from SGS's own witness, Frederick Phillips, who testified as to market conditions in New Zealand at the time of delivery. While the magistrate judge found that Phillips's testimony "supported the difficulties in salvaging the cargo in New Zealand," Report at 6, she found that SGS's attempt to tie East Coast's refusal to buy the fertilizer to market conditions, rather than the contamination, was "supported only by speculation." *Id.*

The fact that the magistrate judge did not find this testimony convincing obviously does not provide grounds for a retrial or a hearing. SGS did not present testimony from anyone at East Coast to establish a causal link. Upon a review of the record, this court agrees that the evidence presented did not tie East Coast's rejection to market and economic conditions.

SGS also objects that Phillips's testimony was not given the appropriate weight by the magistrate judge. She stated that his testimony did not prove specifically any other reasons that East Coast might have rejected the shipment.

Although Phillips was a member of the MAF, he did not handle any of the events concerning the ADELINA. He did not per-

form any testing on the barley seeds, he only knew of the MAF's test results on the barley "by hearsay," and his only involvement with the purchase of fertilizer in New Zealand came from buying small amounts for samples. Transcript ("Tr."), dated 3/11/92, at 111–14.[2]

Interore's attorney asked Phillips whether he had any personal knowledge "as to why East Coast refused to buy the cargo [in 1985]?" Phillips responded: "I have some opinions. I have—no. I could draw a scenario but it's not my job to do that. No, I have no personal knowledge." Tr., dated 3/11/92, at 143. Given that Phillips did not have any such knowledge (or if he did, SGS's attorneys did not elicit it during the trial), it follows logically that his testimony on this point was speculative and therefore unpersuasive—to both the magistrate judge and this court.

**C. David Ritchie's Testimony and Barley Contamination**

SGS claims that the magistrate judge "made an implicit finding that the sound fertilizer could not be segregated from the barley." Def.Obj. at 43. It asserts that this conclusion was erroneous, and that in coming to it the magistrate judge relied too heavily upon the testimony of Interore's expert witness, David Ritchie.

First, SGS's incorrect reading of the report should be pointed out. Upon its arrival in Antwerp, the fertilizer was separated into two categories: "heavily damaged" or "admixed with barley," and "said to be sound."[3] The magistrate judge stated:

> The term "said to be sound" rather than "sound" was used because, by virtue of the nature of the cargo and the *possible* layering of the contaminant, no one was prepared to guarantee that the "said to be sound" cargo was in fact sound. Nonetheless, Interore was able to sell the fertilizer, in various lots, at a substantial price.

Report at 7–8 (emphasis added). It would require a creative reading to find that this

---

**2.** Because the transcript of the trial before the magistrate judge is not consecutively paginated, references are noted by the page within the transcript and the date of the hearing.

**3.** SGS argues that the term "heavily damaged" was never used, but that the more heavily contaminated fertilizer was labelled "admixed with barley." In either case, this category contained the fertilizer in which barley was visible.

statement implicitly finds that the barley was layered throughout the cargo. The relevance of the statement is that MAF officials in New Zealand *believed* that barley was mixed in; this court made such a finding previously, *see* 743 F.Supp. at 255 (Finding of Fact 44), and SGS cannot mischaracterize the report to object to that finding now.

SGS also objects that the magistrate judge "relied heavily" on Ritchie's testimony: "Central to [Chief Magistrate] Judge Gershon's determination that Interore mitigated its damages was her finding that [SGS] did not establish that the barley could have been removed from the fertilizer and that this would have been less costly than the method Interore chose." Def.Obj. at 41.

SGS makes much of the fact that Ritchie is now a member of the Board of Directors of the successor to East Coast. It is not at all apparent to this court that the magistrate judge "relied heavily" on Ritchie's testimony. Her discussion relating Ritchie's understanding did no more than this court's opinion had done previously—find that the MAF believed that the barley was layered throughout the fertilizer.

## II. Objections to Calculations

### A. Interore's Mitigation Costs

▮ SGS argues that the factors leading to Interore's shipping to Antwerp were not ones for which they should be responsible, because they were not damages "resulting from" the contamination of 3.7% of the cargo.

SGS has long contended that New Zealand's particularly strict standards concerning contaminated cargo made the cargo difficult to sell in that country. However, this argument—as stated in the Report—was accounted for by this court's apportioning of damages equally between the two parties. *See* Report at 8 (citing *Interore*, 743 F.Supp. at 260). The court found fault with Interore in part because of its failure to inform SGS of these standards.

Furthermore, SGS has failed to recognize the primary reason that Interore's mitigation costs were assessed against it and added into the final formula of damages. While this court did rule that SGS was not to be held responsible for unforeseeable damages, it did not provide that SGS should not be held responsible for *mitigation costs*. The costs that Interore expended en route to Antwerp were not unforeseeable consequential damages, but costs of mitigation—the costs of salvage that are properly deducted from the fair market value formula.

It is reasonably foreseeable that a negligent misrepresentation could lead to rejection of cargo, and that salvage may reasonably only be obtainable in other ports. *See* Report at 3. That this specific event might transpire need not be reasonably foreseeable; rather, the general type of harm must be. *See Parsons v. Honeywell, Inc.*, 929 F.2d 901, 905–06 (2d Cir.1991) (" 'foreseeability includes the probability of the occurrence of a general type of risk involving the loss, rather than the probability of the occurrence of the precise chain of events preceding the loss. . . .' " (quoting *Tucci v. Bossert*, 53 A.D.2d 291, 293, 385 N.Y.S.2d 328, 331 (2d Dep't 1976))).

### B. Incorrect Formula Used for Calculations

SGS has raised a number of objections broadly complaining that the report "does not reach a logical or equitable result." Def. Obj. at 13. SGS bases this argument primarily on the fact that the invoice value of the Tampa cargo minus the gross sales proceeds shows that the value of the cargo was diminished by a maximum of $91,675.96. Yet such a calculation totally ignores the costs of mitigation that Interore incurred—sales expenses and salvage. It seems obvious to this court (as it did to the magistrate judge) that these mitigation costs are to be factored in when calculating damages based upon differences in market value. *See Ostano Commerzanstalt v. Telewide Systems, Inc.*, 684 F.Supp. 1172, 1176 (S.D.N.Y.1988), *modified*, 880 F.2d 642 (2d Cir.1989). While the cost of salvage was high, the ocean shipment of the goods was necessary.

### C. Incorrect Application of Formula

▮ SGS also claims that damages were incorrectly calculated, even assuming that the magistrate judge applied the correct formula. It argues that damages "should only include reduction in the value of that portion of the fertilizer which could not be segregated from visible barley, the extra unloading

costs incurred in making the separation, and the demurrage costs in New Zealand incurred when the MAF delayed the unloading of the ship." Def.Obj. at 24. According to SGS, these damages total $47,413.27. Upon review of the record, it does not appear that SGS ever proposed this particular breakdown of damages calculation in the past. Nor is it a sound proposal: it purports to sever the damages to only apply mitigation costs to the contaminated fertilizer, when Interore was forced to move the entire shipment to Antwerp.

### D. Weight Loss of Tampa Cargo

■ Interore objects that the magistrate judge awarded SGS a "weight loss" credit. The contaminated cargo was found to be short by a certain weight when it was off-loaded at Antwerp. The pro rata value of this shortage was $39,533. The magistrate judge credited this sum to SGS because "when and how the weight loss occurred is not clear from the record.... While [SGS] is properly charged with reasonable salvage expenses ... it is not properly charged with damage to the cargo not attributable to its conduct." Report at 16.

According to Interore, "[t]he evidence clearly indicates, as well as common sense, that the weight loss occurred during [the] salvage process due to the necessity for repeated handling." Plaintiff's Objections to Report at 6. Consequently, Interore argues, the cost is one that SGS should bear.

The magistrate judge did not accept this argument. This court agrees upon a review of the record that Interore failed to prove that the weight loss must have occurred during salvage. The burden was on Interore to establish where the loss occurred; they have failed to show even that the salvage process, and the "necessity for repeated handling," customarily causes any kind of weight shortage. The magistrate judge appropriately awarded SGS a credit for the weight loss.

### E. Interore's Address Commission

■ Interore objects that in arriving at the total of the salvage costs, the magistrate judge did not account for the "address commission" paid by Interore of $9,874.16.[4] She stated that Interore could not recover the amount as part of its "ocean freight" charges, because it actually did not pay the money as freight, but retained it. The issue was discussed at length at the hearing with Interore's witness, Michael Hefferen. He testified that the payment—which totalled $14,764—was called an address commission, but was in fact applied toward the purchase of liability insurance for the ocean voyage.

Interore claims that the money was an insurance premium, ultimately paid out by it "through an internal memo credit-debt system," Obj. at 8, even though there was not a specific accounting of the figure. However, Hefferen testified on direct examination that Interore retained the $14,764. Tr., dated 3/10/92, at 29. When asked by the court during cross-examination to clarify whether the address commission went back to Interore's parent company, Occidental Petroleum ("Occidental"), the following exchange occurred:

> THE COURT: May I just clarify something because I think the question earlier was, whether or not the address commission goes back to the parent [Occidental]?
>
> HEFFEREN: No, it does not.
>
> THE COURT: I thought you said essentially it does?
>
> HEFFEREN: No, it does not. It never goes back to the parent.
>
> THE COURT: That stays in your pocket?
>
> HEFFEREN: That's correct. We get charged for charterer's liability insurance at the end of the year. It is figured in some way with Frank B. Hall and Occidental Petroleum and whatever it comes out to be, we get charged for it accordingly.

Id. at 48. When attempting earlier to describe the work done by Hall, who apparently was the insurance broker for both Interore and Occidental, Hefferen had stated: "I honestly don't know all the ramifications and

---

4. This amount is actually the pro rata share apportioned to the cargo at issue; the total ad- dress commission was $14,764.

how Frank B. Hall figures out the cost of the charterer's liability insurance. I honestly don't know." *Id.* at 47.

It appears from testimony that Interore retained the address commission. However, even if a payment was ultimately made that accounted for the money Interore claims here, Interore failed to prove at trial that any such amount was owed; Hefferen's testimony was inconclusive. Under these circumstances, SGS is not required to pay the commission.

### F. Pre–Judgment Interest

#### 1. SGS's Objection

■ SGS argues that Interore is not entitled to any pre-judgment interest, because "special circumstances" exist here, namely that both parties were at fault. Def.Obj. at 46. Pre-judgment interest customarily is allowed in maritime tort cases, and should be granted absent exceptional circumstances. *See Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807, 823 (2d Cir.1981).

SGS refers to cases that have limited pre-judgment interest because of "a mutual fault collision in which both parties are damaged." *Iberian Tankers Co. v. Gates Constr. Corp.,* 504 F.2d 747, 747 (2d Cir.1974); *see also Afran Transport Co. v. The Bergechief,* 285 F.2d 119 (2d Cir.1960). These cases base their reasoning upon *The Wright,* 109 F.2d 699 (2d Cir.1940). As Judge Clark explained in that case, admiralty cases in which both parties are at fault, and both parties are damaged, often create an exceptional circumstance. "This is based on the uncertainty as to the party which will have the ultimate liability to make payment on determination of the balance due." *Id.* at 702. That is, where two vessels are damaged and there is mutual fault, it is not clear until ascertained by the court which party is owed the greater amount of damages.

■ In this case, there was mutual fault but injury only to one party, and the dam-ages were ascertainable from the outset.[5] These are not the special circumstances contemplated by the cases that SGS cites, and this court is not persuaded that the policy behind *The Wright* should be extended.

#### 2. Interore's Objection

■ In her report, the magistrate judge directed the Clerk of the Court to use the interest rates paid each month on 52–week United States Treasury bills during the applicable period in calculating pre-judgment interest. Interore complains that the magistrate judge had indicated at trial that she would apply the statutory rate, which under New York law is 9%. Other than a brief discussion in the record, the issue was not discussed or briefed. *See* Tr., dated 3/18/92, at 247–48.

However, in its pre-trial memorandum of law, Interore relied on the precedent of *Ingersoll Milling Machine Co. v. M/V BODENA,* 829 F.2d 293 (2d Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988), for the proposition that the interest rate used in awarding pre-judgment interest rests within the trial court's discretion. Interore claimed that this allowed the court "to tailor the rate of interest to the particular circumstances of the case in order to achieve the purpose of making the injured party whole." Plaintiff's Memorandum of Law in Support of Damages, Submitted March 28, 1991, at 12. Interore made no reference to New York statutory rates or to state law.

In her report, the magistrate judge relied on the broad discretion afforded courts in determining the rate of pre-judgment interest, tying the interest in this case to Treasury bill rates. *See Ingersoll,* 829 F.2d at 311 (because of fluctuations in Treasury bill rates over the relevant period, the district court did not abuse its discretion in applying a rate based on an average for pre-judgment interest); *Independent Bulk Transp., Inc. v. Vessel "MORANIA ABACO",* 676 F.2d 23,

---

**5.** Because damages were easily ascertainable, SGS cannot successfully argue that Interore's damages claim was so excessive that it precluded meaningful settlement negotiations, creating a special circumstance. It may be the case where damages are speculative that a defendant expects a plaintiff's demand to be reduced during negotiation, and that an excessive claim precludes such meaningful negotiations. Here, the damages claimed were high, but they were easily ascertainable. Moreover, SGS cannot argue that the damages are excessive relative to the contract price. Such an argument is precluded because SGS was held liable not based on the contract, but based on a theory of negligent misrepresentation. *See supra* note 1.

25–27 (2d Cir.1982) (plaintiff in admiralty action is entitled to income that monetary damages would have earned, which ought to be measured by interest on short-term, risk-free obligations). She then adopted the Treasury bill formula, because of the fluctuations in interest rates over the long period of time covering the pre-judgment period, citing *In re Potomac Transport, Inc.*, Nos. 82 Civ. 0805 (JFK), 83 Civ. 4597 (JFK), 1993 WL 17206 (S.D.N.Y. Jan. 19, 1993). In that case, the court vacated a judgment prepared by the Clerk of the Court that set the pre-judgment interest rate in an admiralty action at 9%, in compliance with N.Y.Civ.Prac.L. & R. § 5004 (McKinney 1992). Concluding that "federal law applies in admiralty actions," the court employed the "short-term, risk free obligations" logic of *Independent Bulk Transp.*, and tied the pre-judgment interest rates to one-year Treasury bills.

This court agrees with the recommendation in the Report. The magistrate judge indicated from the bench that she thought New York law would provide the applicable pre-judgment interest rate, as it provided the underpinnings of negligent misrepresentation, which was the initial basis of liability. Tr., dated 3/18/92, at 247–48. However, in the Report, she correctly relied on precedent applying federal law to admiralty actions.

■ The court is not required to apply a New York statute setting interest in a case based solely on admiralty jurisdiction, with no assertion of diversity jurisdiction. Indeed, the plaintiff points to no admiralty case in which the New York statute has been applied to pre-judgment interest. The court therefore exercises its discretion and adopts the formula for pre-judgment interest suggested in the Report, finding it to be in full agreement with the precedent and practice of this circuit and the principles of federal admiralty jurisdiction.

*G. Settlement Credit*

■ SGS has also claimed that the Report improperly failed to apportion the proceeds of the settlement that has already taken place between Interore and East Coast.[6] However, the settlement provides that East Coast will pay Interore, through its underwriter, $400,000 in connection with other cargo—not including the fertilizer—on the ship. SGS did not offer any evidence at the trial of the damages portion of this case to indicate that the settlement agreement should not be accepted on its face. As a rule, the court should look to such an agreement on its face to determine the intent of the settling parties. *See Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1208 (10th Cir.1988). Yet SGS made no showing that there was intent contrary to that made plain in the settlement agreement. Because the agreement did not cover damages to the Tampa cargo, it should not be taken into account.

### Conclusion

For the above stated reasons, the report of Chief Magistrate Judge Gershon is adopted in full. Consequently, Interore is entitled to receive from SGS $479,687.72 in accordance with the Report, and pre-judgment interest is to be calculated according to the interest rates paid each month on 52–week United States Treasury bills during the relevant period. Furthermore, in accordance with Federal Rule of Civil Procedure 58, the court orders the Clerk of the Court to prepare a final judgment in accordance with this opinion.

SO ORDERED.

### APPENDIX A

United States District Court

Southern District of New York

International Ore & Fertilizer Corp.,

Plaintiff,

-against-

SGS Control Services, Inc.,

Defendant.

### *REPORT AND RECOMMENDATION*

87 Civ. 6391 (CHT)

GERSHON, Chief Magistrate Judge:

The Honorable Charles H. Tenney, District Judge, following a non-jury trial, has

---

6. Although SGS's objection in this regard consists of one sentence, *see* Def. Obj. at 47, nonetheless it must be addressed. *See* Fed.R.Civ.P. 72(b).

found defendant SGS Control Services, Inc. ("SGS") liable to plaintiff International Ore and Fertilizer Corporation ("Interore") for negligent representation. 743 F.Supp. 250 (S.D.N.Y.1990). In 1985, Interore entered into a contract to sell fertilizer to East Coast Fertilizer Company Limited ("East Coast"). The fertilizer was loaded in Landskrona, Sweden and in Tampa, Florida and transported on the M/V Adelina, which Interore chartered. This suit involves only the Tampa cargo, which was carried in three holds of the vessel.

SGS issued a certificate of cleanliness as to the holds of the M/V Adelina. The holds in fact were not free of barley (which had been transported from England on a prior carriage). In the case of fertilizer, barley is a contaminant. Judge Tenney found that SGS's inspector "knew, or should have known, that his limited inspection did not provide a valid basis upon which to state that the hold was, in fact, free of all possible contaminants. Accordingly, he should not have simply signed a certificate that reasonably led plaintiff to assume it was clean." 743 F.Supp. at 259. Judge Tenney further found that plaintiff shared the blame, in that it failed to notify SGS's inspector of the strict standards of cleanliness required; plaintiff, Judge Tenney found, knew or should have known that even the slightest amount of foreign matter could contaminate the cargo and cause rejection by the New Zealand authorities, who impose extremely strict standards on the importation of foreign vegetable matter. *Id.* at 260. For that reason, SGS was held liable only for fifty percent of "the damages resulting from contamination of the fertilizer." *Id.* Trial of the actual amount of the damages sustained was referred to me. This Report constitutes my findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

Before turning to the facts, certain preliminary legal issues will be addressed. First, Judge Tenney's post-trial finding of liability established that SGS's negligent representation proximately caused Interore to be damaged. "With regard to liability, the concept of proximate cause supplies the legal nexus between act and injury, and provides a necessary basis for awarding compensation." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 159 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993). SGS now seeks to argue that its negligence was not the proximate cause of Interore's loss. Its arguments go to "the legal nexus between act and injury." They should have been presented, if at all, at the liability phase of the trial.

SGS also argues that the damages sought were not reasonably foreseeable. As Judge Tenney has already noted (and as I find would be obvious to anyone in the industry, including SGS), "the risk of an incorrect decision to load might result in a loss of several million dollars...." 743 F.Supp. at 259. Clearly, a negligent representation that a hold is clean could lead to contamination of the cargo to be stowed in the hold. It is also foreseeable that, if a cargo is rejected because of contamination, it may become necessary to salvage it by selling it to other parties and, further, that it may be necessary to ship it elsewhere to obtain a reasonable salvage price, as happened here.

SGS correctly notes that plaintiff is not entitled to consequential damages flowing from a breach by its buyer, East Coast, of its contract with Interore. SGS argues that the damages Interore should be awarded should be no greater than those Interore could obtain from a carrier who failed to comply with its obligations of carriage, generally, the difference between the fair market value of the cargo at destination in the condition in which it should have arrived and the fair market value in the condition in which it did arrive, less salvage. *See Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli,* 814 F.2d 115, 118 (2d Cir.1987); *Encyclopedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 18 (2d Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). In effect, this is what plaintiff seeks. It takes as its starting point the invoice value of the Tampa cargo, and deducts from that its gross salvage recovery, reduced by its sales expenses and other expenses of mitigation.

Plaintiff of course has the obligation to mitigate its damages, but "[t]he burden of showing that a plaintiff unreasonably failed to minimize damages rests with the wrongdoer." *Federal Ins. Co. v. Sabine Towing & Transportation Co., Inc.,* 783 F.2d 347, 350 (2d Cir.1986); *accord Sutton River Services, Inc. v. Inland Tugs Co.* 1985 A.M.C. 858, 862, 1984 WL 1462 (S.D.Ill.1984). Moreover, plaintiff was required only to act reasonably to minimize its damages. It was not required to take extraordinary measures to mitigate nor even measures which, in hindsight, might have been more successful. *See, e.g., Federal Ins. Co.,* 783 F.2d at 350; *Ellerman Lines, Ltd. v. The President Harding,* 288 F.2d 288, 289–91 (2d Cir.1961). Plaintiff is entitled to recover "costs incurred in reasonable attempts to mitigate damages." *Ostano Commerzanstalt v. Telewide Systems, Inc.,* 684 F.Supp. 1172, 1176 (S.D.N.Y.1988), *modified,* 880 F.2d 642 (2d Cir.1989).

On arrival of the vessel at Napier, New Zealand on August 1, 1985, the New Zealand Ministry of Agriculture and Fisheries ("MAF") found the fertilizer to be contaminated with barley. On the same day, Interore's buyer, East Coast, refused to take delivery of the fertilizer. David W. Ritchie, a New Zealand farmer and chairman of New Zealand's Federated Farmers, which exercised great control over the entry of farm products into the country, testified, wholly credibly, as both an expert in New Zealand farming activities and from personal knowledge of the reaction of New Zealand's farmers to the arrival of the vessel bearing contaminated fertilizer on New Zealand's shores. In 1985, Ritchie had been the chairman of the Agricultural Section of the Federated Farmers. There was concern both that the barley was diseased and that, even undiseased, the barley would lead to contamination of barley seed production and the downgrading of New Zealand's malting barley crop.

At the end of August, the MAF cleared the cargo for landing in New Zealand, in the following language: "The barley in and with the fertilizer cargo in the M.V. Adelina at Napier may be introduced subject to all visible barley being removed and destroyed under supervision of an inspector before the cargo of the fertilizer is discharged." This did not change Ritchie's view or that of the Federated Farmers that the cargo should not be landed. It was Mr. Ritchie's understanding at the time that the barley could not be separated out from the fertilizer. According to Mr. Ritchie, the fertilizer could not be salvaged except at a substantial discount. (He noted that under similar circumstances a later cargo of fertilizer had been destroyed.) In his view, its sole use was for pastoral farming, that is, for animal grazing purposes and, since pastoral farmers generally do not purchase high analysis fertilizer which this was, the price would have to have been substantially discounted.

William J. Hueston, who in 1985 was a senior vice-president of plaintiff in charge of trading, described Interore's efforts to mitigate its damages. After the MAF released the cargo for landing in New Zealand, Interore attempted to renegotiate the price with East Coast, but East Coast offered only an unacceptably low salvage price of less than 50%. Interore then sought other potential buyers in New Zealand and Australia but received no offers to purchase the cargo.

Frederick Phillips, a New Zealand economist and government employee, called by SGS, who was not a farmer and had no personal involvement in the events, described the economic climate in New Zealand in 1985. His testimony supported the difficulties in salvaging the cargo in New Zealand. He speculated as to other, market reasons why East Coast may have rejected the fertilizer, but no such reasons were proved. In sum, SGS's argument that the unwillingness of either of the two main buyers of fertilizer in New Zealand, East Coast and Ravenswood, to offer a substantial price for the fertilizer was the result of fluctuations in the currency exchange rate and a drop in demand rather than the reduction in value of the cargo as the result of contamination is supported only by speculation.

SGS's argument that Interore was unreasonable in not dispatching someone to assist John Hayes, its sales representative in New Zealand, in the effort to sell the cargo in

New Zealand is not supported by the evidence. Hayes was in telephonic communication with headquarters. The failure of Interore to locate a buyer in New Zealand was not the result of an unreasonable failure on the part of Interore to have physically sent someone else to New Zealand.

When the cargo could not be sold in New Zealand, potential buyers in Australia and Southeast Asian countries were approached, but this effort also was unsuccessful. Interore also considered discharging the fertilizer and warehousing it for a short time for sale in lots to buyers in New Zealand or Southeast Asia, but it concluded that this would not be cost effective.

Ultimately, Interore transported the fertilizer on the M/V Adelina to Antwerp, where it had a major marketing staff, where storage facilities were readily available, where there was a market for each of the fertilizer blends contained in the shipment and where it could be sold in smaller quantities to maximize the price obtained. Also, the barley was of English origin (see 743 F.Supp. at 252) and apparently of less concern in the European market. The M/V Adelina sailed from Napier on September 27, 1985 and arrived at Antwerp on November 9, 1985.

Alex Etien, Interore's senior shipping and traffic manager, operating from Interore's headquarters in Belgium, had the responsibility to arrange for the discharge operation in Antwerp. He organized a survey at which all interested parties, including SGS, were represented. Water damage was discovered in Hold No. 5 of the ship.

During discharge, the cargo was divided into two categories, heavily damaged (by barley contamination) and "said to be sound." The term "said to be sound" rather than "sound" was used because, by virtue of the nature of the cargo and the possible layering of the contaminant, no one was prepared to guarantee that the "said to be sound" cargo was in fact sound. Nonetheless, Interore was able to sell the fertilizer, in various lots, at a substantial price.

## REASONABLENESS OF MITIGATION.

Applying the standard of mitigation set forth above to the facts, I am satisfied that Interore acted reasonably in its efforts to mitigate its damages. The circumstances it faced were unusual, but it acted with reasonable expedition and efficacy to reduce its injury.

SGS makes much of the fact that the refusal of East Coast to accept the cargo at an adjusted price was contrary to prior experience. But East Coast did ultimately agree to accept the cargo at a reduced price; the problem was that the reduced price was so low that it made economic sense for Interore to transport the fertilizer to Antwerp, with the attendant shipping and other costs, rather than to accept East Coast's proposal. SGS has not disputed that Interore's damages are less because of its decision not to accept East Coast's reduced price. Moreover, the extent to which the unusually strict nature of New Zealand's attitude toward the importation of even minimally contaminated foreign vegetable matter may have enhanced the damages, in that it affected East Coast's response to the cargo and the response of the other potential New Zealand buyer, forcing plaintiff to seek more distant buyers, is accounted for in Judge Tenney's determination to apportion the damages equally between SGS and Interore. See 743 F.Supp. at 260.

The reliance by SGS on M. Golodetz Export Corp. v. S/S Lake Anja, 751 F.2d 1103, 1112 (2d Cir.), cert. denied, 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985), is misplaced. There, the goods at destination, though nonconforming, were marketable, but plaintiff allowed the goods to sit and, by their nature, lose value, for eighteen months while it tried to force acceptance through arbitration, rather than attempting to mitigate through third-party sales. Here, in contrast, Interore spent a reasonable time attempting to clear the goods for landing at Napier and convince its buyer to accept them, but then moved to obtain other buyers.

SGS also argues that it would have been easy to remove the barley, and presumably make it acceptable in the New Zealand market, but the evidence does not establish that the effort needed to accomplish this would

ultimately have been less costly, and have led to less damage to plaintiff, than the method Interore chose. While ultimately Interore was quite successful in selling the fertilizer in Europe, a "substantial amount of barley grains" were in the cargo holds, 743 F.Supp. at 252, a surveyor at Napier found "barley lodged on the overheads, stringers [horizontal bars extending down the sides of the holds] and hatch covering returns," *id.* at 255, and it was "believed the barley was layered throughout the heap...." *Id.* Moreover, in addition to the cost of removing the barley, plaintiff would have had other expenses, including the expenses of discharge and warehousing, and it had no assurance that the fertilizer would be sold in Napier. It cannot be said that Interore's decision to transport the fertilizer to Antwerp was unreasonable.

## VALUE OF GOODS AT DESTINATION.

Interore reasonably takes as its starting point in determining damages the invoice value of the Tampa cargo, $2,691,003.96. In the absence of non-speculative, persuasive evidence that the invoice value did not fairly reflect the fair market value of the cargo in the condition in which it should have arrived at Napier, the invoice value will be accepted. *See, e.g., Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1228 (11th Cir.1983); *M. Prussman Ltd. v. M/V Nathanel,* 684 F.Supp. 372, 374 (S.D.N.Y.1988); *C. Itoh & Co. (America), Inc. v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 598 (S.D.N.Y.1979).

## SALES PROCEEDS ON SALVAGE.

The gross proceeds of the Tampa cargo sold at Antwerp was $2,599,328.00. Undisputed sales expenses of $280,211.00 were incurred on the Tampa cargo, yielding net sales proceeds for the Tampa cargo of $2,319,117.00.

SGS argues that, since, upon discharge at Antwerp, only a small fraction of the cargo was found to be heavily damaged with barley, the cargo should be found not to have lost value except to the extent of that fraction. This argument is unpersuasive. That plaintiff was able to obtain a good recovery for the cargo at Antwerp does not belie the extreme

reduction in value of the cargo at its place of destination, Napier. The good recovery obtained by plaintiff at Antwerp ultimately inures to SGS's benefit by reducing plaintiff's damages.

Defendant, also argues, citing *Trade Arbed, Inc. v. M/V Swallow,* 688 F.Supp. 1095, 1106 (E.D.La.1988), that when it is possible to segregate sound from damaged cargo, a carrier is liable only for the diminished value of the damaged portion. But it has not been established "that a discrete, identifiable portion of the cargo was not actually damaged." 688 F.Supp. at 1106. Defendant has not established that plaintiff could have achieved a better economic result had it separated the cargo into "heavily damaged" and "said to be sound" lots in Napier. "Said to be sound" fertilizer apparently was acceptable in Europe, but there is no showing that the New Zealand farmers would have accepted it as uncontaminated. On the contrary, it is clear that they would not. The evidence does not support the conclusion that it would have been economic to discharge, store, clean and then attempt to sell the fertilizer at Napier, much less that it was unreasonable for Interore to have made the choice it made.

## EXPENSES OF SALVAGE.

### Demurrage.

Interore seeks $93,485.66 in demurrage expense for 58 days in which the ship remained at Napier. For nearly a month after the ship arrived at Napier and the cargo was rejected by East Coast, Interore pursued efforts to have East Coast accept the cargo; when that failed, efforts were made to salvage it through other buyers. SGS is entitled to a reduction of the sum requested by $24,225.00, an amount already received by Interore from its insurer, Firemen's Fund, for demurrage incurred at Firemen's Fund request so that representatives of Firemen's Fund could inspect the cargo at Napier. That demurrage is not properly chargeable to SGS, and Interore has in any event already been reimbursed for it. That Firemen's Fund is plaintiff's subrogated insurer does not alter this result. No proof was offered that the period of delay attributed to Firemen's Fund in any way contributed to

the mitigation effort or is otherwise properly chargeable to SGS.

In addition, since the balance of $69,260.66 ($93,485.66 − $24,225.00) represents demurrage for the entire ship, which was carrying both the Tampa cargo involved in this litigation and the Swedish cargo, the demurrage should be prorated by weight. The parties have agreed that the Tampa cargo constituted 66.88% of the total. Therefore, the amount of demurrage reasonably attributed to Interore's mitigation efforts is $46,321.53.

### Ocean Freight.

Interore seeks to recover ocean freight charges of $575,813.00 plus a $14,764.00 sum described as an "address commission," which Interore retained, for a total of $590,577.00, for transporting the Tampa cargo on the M/V Adelina from Napier to Antwerp. First, Interore is not entitled to the $14,764.00, which it did not in fact pay as freight, but retained. Second, according to the charter party covering the voyage, the freight was calculated on a per ton basis, and the Swedish cargo was also on board. Therefore, as with the demurrage, Interore's ocean freight expense should be prorated by weight to $385,103.88 ($575,813.00 × 66.88%). So reduced, the ocean freight is properly deducted from the salvage proceeds as necessary to effect plaintiff's mitigation of its damages.

### Marine Insurance.

Although Interore did not insure the cargo from Tampa to New Zealand, because it did not consider itself to have title, after East Coast refused to take delivery, Interore insured the Tampa cargo from New Zealand to Antwerp, at a prorated cost of $29,599.67. This expense was reasonably incurred as part of the salvage operation and therefore is properly deducted from the salvage proceeds.

### Surveyor Fees.

SGS argues that the surveyor fees were not reasonably related to the salvage operation, but rather were litigation costs. Interore's position is that they were incurred to determine the amount of damage in New Zealand and to record and assist the salvage at Antwerp.

The evidence supports that some, but not all, of Interore's survey expenses were reasonably incurred as part of its effort to mitigate its damages. The following expenses are found to be reasonable:

$1,191.00 to Beckman & Jorgensen

$5,521.67 to Dominion Adjusters

$53.72 to SGS Van Bree

$1,642.16 to Yves de Grave

$1,631.25 to Dr. Thomas Carroll

The total, $10,039.80, must be prorated by weight (66.88%), which yields $6,714.62.

### Warehouse Costs.

Interore paid $83,523.84 for warehousing the Tampa cargo in Antwerp during the salvage operation. This expense was reasonably incurred in order to effectuate mitigation of plaintiff's damages. SGS argues that the sum of $21,487.00, included in that amount, which was a surcharge negotiated by Mr. Etien, should be excluded as unreasonable. Based upon Mr. Etien's testimony, this expense was necessary and reasonable and therefore is fairly charged to SGS as an expense of salvage.

### Discharge Costs.

Interore incurred discharge, *i.e.*, stevedoring, costs of $86,551.64 at Antwerp for the Tampa cargo and seeks to reduce its salvage recovery by that sum as a reasonable expense of salvage. SGS argues that, since Interore would have had discharge expenses at the port of destination, it cannot deduct the discharge expenses incurred in Antwerp. Interore responds that, since its contract with East Coast was "free out," meaning that East Coast and not Interore bore discharge expenses, Interore may properly deduct its discharge expenses from its salvage recovery.

Without regard to whether Interore or East Coast was responsible for discharge at Napier, since Interore's ability to salvage the cargo depended on its discharging the cargo—and presumably the price it obtained from its buyers reflected the fact that Interore paid for off-loading—it is reasonable to deduct Interore's discharge expenses from its salvage recovery.

### Inland Freight.

It is undisputed that Interore was invoiced and paid $6,320.98 for inland freight for the Tampa cargo during the salvage of the Tampa cargo. This amount is reasonably deductible from the salvage proceeds.

### Miscellaneous Expenses.

It is undisputed that Interore was invoiced and paid $714.63 for bank and miscellaneous expenses relating to the salvage of the Tampa cargo. This amount is reasonably deductible from the salvage proceeds.

### CREDITS TO DEFENDANT.

SGS seeks "credit," *i.e.*, a reduction in the damages, for weight loss to the entire Tampa cargo and water damage to the cargo in Hold No. 5, and it seeks to share in a recovery which Interore received in a settlement with East Coast.

### Weight Loss.

When the cargo was off-loaded in Antwerp, it was determined to be short. Defendant argues that it is entitled to a weight loss credit of $39,533.00 reflecting the pro rata value, by weight, of the shortage. Plaintiff's sole argument in response is that, since title had passed to East Coast as soon as the cargo was loaded on the ship, East Coast was at risk for the weight loss, not plaintiff; therefore, plaintiff would have been paid the total invoice value, had the cargo not been contaminated.

To begin with, when and how the weight loss occurred is not clear from the record. Plaintiff argues that it occurred of necessity because of the handling involved in the salvage operation, but the evidence does not establish that. In any event, SGS is simply not responsible for weight shortage. While defendant is properly charged with reasonable salvage expenses, since they reduce plaintiff's salvage recovery, it is not properly charged with damage to the cargo not attributable to its conduct. It is one thing to say that Interore can use the invoice value as the starting point for determining fair market value at the point of destination. It is another to say, as Interore in effect does here, that SGS bears the risk of weight loss as if it stands in the shoes of the buyer and is liable on the contract. Thus, the total damages to Interore must be reduced by the weight loss.

### Water Damage.

Similarly, $17,829.31 worth of the Tampa fertilizer was found to be water damaged upon arrival at Antwerp. SGS is entitled to have the damages reduced by this amount, because it is not responsible for that damage. Interore argues that the water damage occurred during the salvage operation and therefore is reasonably chargeable to SGS. I disagree. Whether viewed as nonforeseeable, or as caused by an intervening agency, the water damage cannot fairly be attributed to SGS's conduct. Interore's argument that the water damaged fertilizer also contained barley does not save its position, for plaintiff simply assumes, without establishing, that that fertilizer was nonsalvageable had there been no water damage. Interore's witness, Mr. Etien, was unable to state whether, had the fertilizer in Hold No. 5 not been water damaged, any of it could have been salvaged as "said to be sound." According to Etien's Report, there was only a small amount of grain in Hold No. 5 and, in light of the water damage, no attempt was made to segregate that portion of the water damaged fertilizer which contained it. Under these circumstances, SGS may not be charged with any of the loss of the water damaged cargo in Hold No. 5.

### Settlement Credit.

The Settlement Agreement with East Coast arises out of litigation in New Zealand between East Coast, Interore and various insurers of East Coast in which Interore and East Coast asserted claims against the other arising out of the Swedish and Tampa cargos. The Agreement provides that East Coast's underwriter will pay Interore $400,000 "relating to the [Swedish] cargo" and allocates payments of any recoveries the parties to the Agreement may receive from prosecuting claims against other parties. The Settlement Agreement further provides that it releases all signatories as to all claims arising out of the alleged sale, transportation and salvage of all of the cargo, whether loaded at Tampa or Sweden.

SGS acknowledges that Interore was free to seek recovery from any parties responsi-

ble to it and that the potential liability of East Coast does not bar Interore from seeking damages from SGS. However, SGS argues, since Interore received $400,000.00 to settle all of its disputes with East Coast, including its disputes over the Tampa cargo, the allocation in the Settlement Agreement must be viewed as "illusory" and SGS given a credit of $261,360.00, based upon an apportionment by value of the Swedish and Tampa cargos. (It is undisputed that the Tampa cargo represented 65.34% of the total value of the two cargos).

SGS offers no legal authority for looking behind the terms of the Settlement Agreement and no factual basis for determining that the settlement proceeds should be allocated other than as set forth in the Settlement Agreement. *Cf. Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1208 (10th Cir.1988) (court "must look to the settlement [agreement] to determine the intent of the settling parties as to what damages and claims are covered").[1] Under these circumstances, SGS's request for a credit based upon the Settlement Agreement should be denied.

## CALCULATION OF DAMAGES

| | | |
|---|---|---|
| Invoice Value | | $ 2,691,003.96 |
| Gross Sales Proceeds | $ 2,599,328.00 | |
| Less Sales Expenses | ($ 280,211.00) | |
| Net Sales Proceeds | $ 2,319,117.00 | |
| | | |
| Less Expenses of Salvage Operation | | |
| Demurrage | ($ 46,321.53) | |
| Ocean Freight | ($ 385,103.88) | |
| Marine Insurance | ($ 29,599.67) | |
| Surveyor Fees | ($ 6,714.62) | |
| Warehouse Costs | ($ 83,523.84) | |
| Discharge Costs | ($ 86,551.64) | |
| Inland Freight | ($ 6,320.98) | |
| Misc. Costs | ($ 714.63) | |
| | | |
| Total | ($ 644,850.79) | |
| | | |
| Net Proceeds of Mitigation | | ($ 1,674.266.21) |
| | | |
| Total Damages | | $ 1,016,737.75 |
| | | |
| Less Damages for Which SGS is Not Responsible, i.e., Weight Loss, $39,533.00, Water Damage, $17,829.31 | | ($ 57,362.31) |
| Total for Which SGS Shares Responsibility | | $ 959,375.44 |
| | | |
| Divided by 2 Yields | | $ 479,687.72 |

In sum, plaintiff is entitled to a damage award against SGS in the amount of $479,687.72.

### Prejudgment Interest.

Plaintiff is also entitled to pre-judgment interest on its damages. The parties agree

1. Interore's potential claims against East Coast were not identical to those against SGS, nor were the measures of damages identical. Interore here obtains damages for negligent representation, not breach of contract, and has been awarded only half of those damages in any event.

that there is no diversity jurisdiction in this case and that the case therefore arises solely under the court's admiralty jurisdiction. In the absence of special circumstances, which do not exist here, prejudgment interest is recoverable for commercial maritime torts. *E.g., Sutton River Services, Inc. v. Inland Tugs Co., supra*, 1985 A.M.C. at 864. This principle is not affected by plaintiff's shared fault. *See Alkmeon Naviera, S.A. v. M/V "MARINA L"*, 633 F.2d 789, 798 n. 12 (9th Cir.1980). As stated in *Independent Bulk Transport, Inc. v. Vessel "Morania Abaco"*, 676 F.2d 23, 25 (2d Cir.1982):

> Although it is an abuse of discretion to deny prejudgment interest in admiralty cases except under extraordinary circumstances, *see Mitsui & Co. v. American Export Lines, Inc.*, 636 F.2d 807, 823 (2d Cir.1981), the district court has broader discretion to determine when interest commences and what rate of interest to apply. *See The Hygrade No. 24 v. The Dynamic*, 233 F.2d 444, 448 (2d Cir.1956).

Here, neither plaintiff nor defendant has proposed a particular rate. Plaintiff simply asks the Court to exercise its discretion. Since the pre-judgment interest in this case covers a long period of time, during which interest rates varied considerably, the Clerk should be directed to use the interest rates paid each month on 52–week United States treasury bills during the applicable period, *In re Potomac Transport Inc.*, Nos. 82 Civ. 0805 (JFK), 83 Civ. 4597 (JFK), 1993 WL 17206 (S.D.N.Y. Jan. 19, 1993). *See Independent Bulk Transport, Inc.*, 676 F.2d at 27 ("Plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations."). I recognize that the interest rate I propose is identical to that used in fixing *post*-judgment interest and that the pre-judgment rate should not necessarily be the same. In this case, however, that rate is the appropriate one to apply. Finally, in the absence of a single date from which damages flowed, a reasonable intermediate date, February 1, 1986, should be used.

Copies of this report are being mailed today to plaintiff's and defendant's counsel who are hereby put on notice that any objections to this report must be made in conformity with 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thus, a party must serve and file, with a copy to me, specific written objections to the report within ten (10) days after being served with a copy of this report. A party that fails to file timely objections waives the right to further judicial review, including appellate review, of the decision. *Small v. Secretary of HHS*, 892 F.2d 15, 16 (2d Cir.1989). *See Thomas v. Arn*, 474 U.S. 140, 148–53, 106 S.Ct. 466, 471–74, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988). Any requests for extensions of time to file objections should be made to Judge Tenney.

Respectfully submitted,

/s/ Nina Gershon

Nina Gershon

Chief Magistrate Judge

Dated: New York, New York

March 31, 1993

Copies to: Honorable Charles H. Tenney

District Judge

Robert A. Milana, Esq.

J. Scot Provan, Esq.

Richard H. Sommer, Esq.

Kirlin, Campbell & Keating

14 Wall Street

New York, New York 10005

Charles B. Updike, Esq.

Scott M. Riemer, Esq.

Nancy Connery, Esq.

Schoeman, Marsh & Updike

60 East 42nd Street

New York, New York 10165